IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| VANESSA BAUTISTA,<br>*Plaintiff* | §<br>§<br>§ | |
| | § | SA-22-CV-00247-XR |
| -vs- | §<br>§ | |
| MPII, INC., MICHAEL CZERWIEN,<br>*Defendants* | §<br>§<br>§ | |

**ORDER**

On this day, the Court considered Defendant MPII, Inc's ("MPII") motion for summary judgment (ECF No. 79). After careful consideration, MPII's motion for summary judgment is **GRANTED in part and DENIED in part**.

**BACKGROUND**

This is a sexual harassment and retaliation case under Title VII of the Civil Rights Act of 1964 and the Texas Labor Code.[1] MPII is a funeral services company that owns and operates several funeral chapels, funeral homes, and cemeteries in San Antonio, Texas. ECF No. 79 at 7. Kristy Tips ("Tips") is MPII's President and Michael Hoffman ("Hoffman") is the General Manager. *Id.* In June 2020, MPII's Mission Park Funeral Home hired Plaintiff Vanessa Bautista ("Bautista") as a sales representative. *Id.* at 9. She worked at MPII for around fifteen months. *Id.*

Michael Czerwien ("Czerwien")—who has worked at MPII for over fifteen years—is a sales manager. ECF No. 84-1 at 243, 290. Beginning in April 2021, Czerwien allegedly harassed

---

[1] While Bautista initially asserted a sex-discrimination claim, she abandoned it at summary judgment. *See* ECF No. 84 at 24 ("Plaintiff's claims are based on sexual harassment and a sexually hostile work environment claim," not "discriminat[ion] against her based-on sex"). The Fifth Circuit recognizes that a party may abandon a claim by not raising it in opposition to a motion for summary judgment that challenges it. *Vela v. City of Houston*, 276 F.3d 659, 678 (5th Cir. 2001). Nor does Bautista demonstrate she "was replaced by [a non-female employee] or was treated less favorably than other similarly situated employees outside her class." *Haire v. Bd. of Supervisors of La. State Univ. Argic. & Mech. Coll.*, 719 F.3d 356, 363 (5th Cir. 2013). This claim is dismissed with prejudice.

1

and made sexually inappropriate comments to Bautista, including in the presence of her co-workers.[2] These included "daily" remarks such as "do you dream of me with my tie on or without it," comments on her breast size, and questions about her intimate sex life and underwear she wore. *Id.* at 101-03. Czerwien would ask Bautista why she went "so big" with her [breasts], whether she liked "[her] [breasts]," and whether her husband liked "[her] [breasts]." *Id.* at 101. In one incident, Czerwien allegedly told her that she "probably needed a good f_____ from her husband." *Id.* at 94.[3] Czerwien's actions were allegedly not limited to verbal conduct. He allegedly played with Bautista's hair and one day grabbed her head and bobbed it up and down to simulate oral sex, while telling her to look at the camera.[4] *Id.* at 108–09. Bautista also took offense to Czerwien taking photos of her next to a field of grass without her consent. *See id.* at 91–94. And he allegedly used abusive language, including calling Bautista "b_____." *Id.* at 146.

Czerwien's conduct was allegedly not limited to Bautista. Ms. Saenz, who worked in sales at MPII, testified that Czerwien asked about female employee's breast size "a lot," including her own, and commented on whether girls in the cemetery were wearing underwear on a "consistent basis." *Id.* at 292. Like Bautista, Ms. Saez testified that Czerwien would ask if she dreamt about him with his tie on. *Id.* at 293. Another employee, Kerri Moody, testified that Czerwien asked her "when you do a good job, do you like a slap on the ass or is a pat on the back ok." *Id.* at 365–66.

None of this conduct was not reported to MPII management until, at the earliest, September 6, 2021. Despite an employee handbook that included an anti-harassment policy, procedures to

---

[2] Czerwien denies Bautista's allegations. *See id.* at 246, 248–49. These are disputed issues of fact inappropriate for resolution at this stage.

[3] Bautista claims that she conveyed this incident to three co-workers at MPII. *Id.* at 97–98.

[4] MPII attached video surveillance on the day of this incident which does not show that it occurred. ECF Nos. 80–9, –10, –11. Tips testified that she reviewed the footage from "the entire day" and did not see it either. ECF No. 84–1 at 230.

2

report harassment, and statement of prompt investigation, ECF No. 80-5 at 8–9, Bautista never reported Czerwien's actions when they occurred. ECF No. 84-1 at 109. While Ms. Saez reported Czerwien's comments about her breasts to Hoffman on September 21, 2021—her last day of employment—she did not report it to MPII before. *Id.* at 292, 296–97. By this time, Bautista had left MPII.

On or about August 19, 2021—after working for a little over a year—Bautista took leave to quarantine after testing positive for COVID-19. ECF No. 79 at 9. On August 31, 2021, she returned to work. *Id.* After leaving early the next day to do "home visits," ECF No. 84-1 at 145, she never came back. When she left, she cleared out her desk, although disputed issues of fact remain as to whether some personal items remained. *See id.* at 142 (left behind a windchime and decorations), 354 ("she still had some items there"). This case turns on what happened over the next few days.

Although Bautista was scheduled to work on September 2, she never showed up. *Id.* at 144; *see also* ECF No. 80-13 (MPII's schedule listing Bautista's shifts throughout September 2021). Instead, she claims she called and texted Tips notifying that she was sick again with possible COVID-19 issues. ECF No. 84-1 at 151–52.[5] On September 3, Bautista again claims she "called in" to MPII but nobody answered. *Id.* at 144.[6] This same day, she emailed a letter to Tips, Robert Tips,[7] and Czerwien with several complaints related to COVID-19 pay and safety precautions, a missed work trip, and abusive language from Czerwien. *Id.* at 202–06. This letter did not reference any sexual harassment. By this time, Bautista retained an attorney, Veronica Farias, who was

---

[5] While Bautista claims she sent Tips an email on this day as well, *id.*, this email is not in the record.

[6] Hoffman testified that notifying MPII of sickness would be appropriate notice regarding the "no-call-no-show" policy. *Id.* at 266–67.

[7] Robert Tips is Tips' husband and owner of MPII. *Id.* at 243.

3

copied on the communication. *Id.* Bautista forwarded this letter to Hoffman and another employee at MPII the next day. *Id.* at 208–13.

The weekend passed with no interactions. On Monday, September 6, 2021, Bautista again did not show up to work but emailed a second complaint to Tips and her husband.[8] This one detailed Czerwien's sexual harassment, including the incidents where Czerwien allegedly (i) grabbed her head and bobbed it up and down and (ii) told her that her husband needs to give her a "good fxxxxing." ECF No. 84-1 at 215–17. This was the first time Bautista notified MPII's management of Czerwien's sexual harassment.[9] Bautista's attorney, Ms. Farias, also called Tips on September 6, but she did not pick up this call and instead contacted MPII's counsel. ECF No. 84-1 at 233. As of September 6, 2021, Bautista did not tell MPII she resigned.

On September 8, 2021—after not receiving any response from MPII—Bautista sent a third letter requesting a response. *Id.* at 219–20.[10] That same day, MPII's counsel, Jonathan D. Pauerstein, responded to Bautista through her attorney. This letter stated that Bautista "abandoned her job duties and cleaned out her desk," that Bautista's statements about Czerwien's sexual harassment were "defamatory," and that she was barred from MPII's facilities. *Id.* at 222.

---

[8] She also texted Tips to notify her of potential COVID-19 exposure from her family. ECF No. 80-17 at 3.

[9] While the message was returned as "blocked" and undeliverable to Robert Tips, ECF No. 80-17 at 5, it appears to have been delivered to Tips, who testified that she did not recall when she received it, but that she received it. ECF No. 80–1 at 230.

[10] The record contains a letter from Hoffman to Bautista dated September 7, 2021 which states she "made the voluntary decision to terminate [her] employment" by "remov[ing] all of [her] personal items from the workplace" and her "failure to show up for [her] upcoming shifts." *Id.* at 401. While Hoffman was not included on the September 6 email, the record is unclear whether he was made aware of the sexual harassment allegations before writing this letter. ECF No. 80-20 at 12. The record is also unclear when this letter was ever sent or received. In any event, it is dated after September 6, MPII does not rely on it, and it does not affect the Court's determination.

4

Two weeks later, on September 21, 2021, Bautista received a formal notice of termination from SWBC Professional Employer Services I, L.L.C. ("SWBC").[11] ECF No. 79 at 13. This letter stated that Bautista's employment ended on September 7, 2021 due to her "resign[ation]." *Id.*

This action followed. On March 14, 2022, Bautista filed her initial complaint against MPII and SWBC, asserting claims under Title VII and Texas state law. ECF No. 1.[12] She amended her complaint on July 14, 2024 to add individual defendants—Robert and Kristin Tips and Czerwien— and asserted state law sexual harassment claims against them in their individual capacity. ECF No. 25. On March 17, 2023, the Court granted in part and denied in part MPII's motion to dismiss. The Court (i) dismissed Bautista's sexual harassment claims against the individual defendants, (ii) dismissed the retaliation claims against the individual defendants, and (iii) let the rest proceed.[13] Bautista then stipulated to dismissing its claims against SWBC with prejudice. ECF No. 50. After discovery, MPII moved for summary judgment. ECF No. 79. This matter is now ripe for resolution.

## **LEGAL STANDARD**

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non–moving party's claim or defense, or, if the crucial issue is one for which the nonmoving party will bear the

---

[11] SWBC is a professional employer organization. MPII contracted with SWBC to provide employees and handle payroll. SWBC was also involved in conducting investigations of harassment complaints. *See id.* at 228.

[12] Bautista states she filed her charge of discrimination against SWBC and MPII in November 2021 and received her EEOC right to sue letter in December 2022. ECF No. 25 at 7. The Court is unclear if this is a typographical error (to mean December 2021) and cannot determine whether Bautista properly exhausted her complaint before filing this case. But the exhaustion requirement is not jurisdictional and is "subject to waiver[.]" *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162 (5th Cir. 2018). As MPII did not raise this defense, it does not bar Bautista's claims.

[13] The Court dismissed Bautista's state law sexual harassment claim against the individual defendants without prejudice to allow her to amend. ECF No. 42 at 7. Bautista did not do so.

burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the nonmovant's claim or defense. *Little v. Liquid Air Corp.*, 952 F.2d 841, 847 (5th Cir. 1992), *on reh'g en banc*, 37 F.3d 1069 (5th Cir. 1994) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Although Rule 56(e) does not allow a party to rest upon the mere allegations or denials of his pleading when his adversary moves for summary judgment, the Rule does not relieve the movant of his duty to establish the absence of a genuine issue as to material facts. The moving party still has the initial burden, under Rule 56(c), of showing the absence of a genuine issue concerning any material fact, and of showing that judgment is warranted as a matter of law." *Boazman v. Econ. Lab'y, Inc.*, 537 F.2d 210, 213–14 (5th Cir. 1976) (citations and quotation marks omitted).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial," not to force the nonmoving party to disclose every aspect of its anticipated trial strategy. Advisory Committee Note to 1963 Amendment of Fed. R. Civ. P. 56(e). Once the movant carries its initial burden, the burden shifts to the nonmovant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991). Any "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment," *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003), and neither will "only a scintilla of evidence" meet the nonmovant's burden. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). Rather, the nonmovant must "set forth specific facts showing the existence of a 'genuine' issue concerning every essential component of its case." *Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998). The Court will not assume "in the absence of any proof . . . that the nonmoving party could or would prove the necessary facts" and will grant summary judgment "in

any case where critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant." *Little*, 37 F.3d at 1075.

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the nonmovant, or, in other words, that the evidence favoring the nonmovant is insufficient to enable a reasonable jury to return a verdict for the nonmovant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the nonmovant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The Court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the nonmoving party. *First Colony Life Ins. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## ANALYSIS[14]

### I. Title VII

Enacted to "assure equality of employment opportunities," *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44 (1974), Title VII makes it an "unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e–2(a)(1). Title VII has a separate anti-retaliation provision which prohibits an employer from "discriminat[ing] against" an employee or job applicant because that individual "opposed any practice" made

---

[14] MPII objects to Exhibit N to Plaintiff's Appendix. ECF No. 87 at 2. Exhibit N contains summaries of various depositions taken in this matter. Because the Court does not rely on this evidence in its determination, MPII's objection is overruled as moot.

7

unlawful by Title VII or "made a charge, testified, assisted, or participated in" a Title VII proceeding or investigation. § 2000e–3(a).

Bautista asserts two claims under Title VII: sexual harassment and retaliation.[15] Different frameworks apply to each, so the Court analyzes them in turn.

## II. Sexual Harassment

Title VII "forbids sexual harassment in the workplace as a form of sex discrimination." *Newbury v. City of Windcrest, Texas*, 991 F.3d 672, 755 (5th Cir. 2021) (citing *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 838–39 (5th Cir. 2015) (per curiam)). "There are two types of sexual harassment under Title VII: *quid-pro-quo* and hostile-environment harassment." *Id.* (citing *Casiano v. AT&T Corp.*, 213 F.3d 278, 273 (5th Cir. 2000)). A quid pro quo theory provides no affirmative defense to the employer and an employer is *per se* vicariously liable. *See Casiano*, 213 F.3d at 283–84. Bautista tries both, ECF No. 84 at 24–25, but fails on each.

**Quid Pro Quo.** "To establish a Title VII quid pro quo claim, a plaintiff must show that the acceptance or rejection of a supervisor's alleged sexual harassment resulted in a 'tangible employment action.'" *Alaniz v. Zamora-Quezada*, 591 F.3d 761, 772 (5th Cir. 2009) (citing *La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 481 (5th Cir. 2002)). The Fifth Circuit has defined sexual harassment as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature." *Davenport v. Edward D. Jones & Co., L.P.*, 891 F.3d 162, 171 (5th Cir. 2018) (internal alterations and citations omitted). "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote,

---

[15] While neither party addressed Bautista's state law claims, the statutory scheme of the Texas Labor Code is, with exceptions not applicable here, a mirror image of Title VII. *See Prairie View A & M Univ. v. Chatha*, 381 S.W.3d 500, 507 (Tex. 2012); *AutoZone, Inc. v. Reyes*, 272 S.W.3d 588, 592 (Tex. 2008) ("By adopting the [TCHRA], the Legislature 'intended to correlate state law with federal law in employment discrimination cases'") (citations omitted)). So the disposition of Bautista's federal law claims mandate the same conclusion as to her state-law claims.

reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Alaniz*, 591 F.3d at 772 (quoting *La Day*, 302 F.3d at 481-82). "[A] plaintiff must show a 'causal nexus' between the acceptance or rejection of the sexual advances and the tangible employment action." *Id.* "[T]emporal proximity evidence can be considered along with other circumstances in deciding causation." *Frensley v. North Miss. Medical Ctr., Inc.*, 440 F. App'x 383, 387 (5th Cir. 2011) (per curiam) (citing cases).

Viewing the facts in the light most favorable to Bautista, she advances sufficient facts that constitute sexual harassment. Bautista was fired after she reported her complaint of sexual harassment, and the timing was "very close" and sufficient at this stage to establish a "causal nexus." *Davila v. Webb County*, 5:12-CV-42, 2014 WL 12600791, at *6 (S.D. Tex. Sep. 23, 2014) (citations omitted). But even assuming the "tangible employment action" could be taken by the non-harasser,[16] Bautista's quid pro quo claim fails because the harasser—Czerwein—was not her supervisor.

Bautista consistently refers to Czerwien as her "supervisor" throughout her briefing, but merely saying so does not make it true. A "supervisor" is defined as an employee who has the power to "take a tangible employment action," such as "hiring, firing, failing to promote, reassigning with significantly different responsibilities, or causing a significant change in

---

[16] A recent unpublished Fifth Circuit case holds it must be. In *Taylor v. McDonough*, the panel rejected a quid pro quo claim because there was insufficient evidence of a tangible employment action since the harasser was not the one who terminated the plaintiff. No. 23-60106, 2024 WL 1504343, at *5 (5th Cir. April 8, 2024) (per curiam) (citing cases). At least one other case has held that the "tangible employment action" does not require that the harasser be the one who takes the adverse employment action. *See Thornhill v. Finley, Inc.*, No. 07-CV-1033, 2008 WL 4344887, at *4 (W.D. La. Sep. 23, 2008) (finding a jury could "reasonably determine" that the harasser influenced the ultimate decision to terminate plaintiff's employment" and thus "who verbally informed plaintiff that she was fired from her job is not determinative"). Even under the relaxed approach, there is no evidence (nor does Bautista argue) that Czerwein played any role in her discharge.

benefits." *Vance v. Ball State Univ*, 570 U.S. 421, 430 (2013)). Czerwien lacked this power.[17] He did not have the power to fire, promote, or reassign Bautista. No evidence in the record suggests he could affect her benefits. Czerwin was, at best, Bautista's manager. While he may have provided input on her performance and been involved in her hiring, this is not enough to meet the standard for a "supervisor." *See Vance*, 570 U.S. at 433 (rejecting approach that would tie supervisor status to the "ability to direct a co-worker's labor to some ill-defined degree"); *Matherne v. Ruba Mgmt.*, 624 F. App'x 835, 840 (5th Cir. 2015) (per curiam) ("mere 'leadership responsibilities' and 'the authority to assign [job responsibilities]' are insufficient to place an employee in the 'unitary category of supervisors' with authority to cause a 'significant change in employment status'") (citing *Vance*, 570 U.S. at 441–43).

**Hostile Environment.** To establish a claim for hostile work environment, Bautista must show: (1) she belongs to a protected group; (2) she was subject to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment was sufficiently severe or pervasive so as to alter the conditions of employment and create an abusive working environment; and (5) the employer knew or should have known and failed to take prompt remedial action. *Watts v. Kroger Co.*, 170 F.3d 505, 509 (5th Cir. 1999).[18] Unlike the quid pro quo theory, an employer has an affirmative defense if it proves that "(1) [it] exercised reasonable care to prevent and correct promptly any such sexual harassment; and (2) the employee unreasonably failed to take advantage

---

[17] Czerwien never issued write-ups, performance improvement plans, or reprimands. ECF No. 84-1 at 65–66. Although he carried business cards that said "Sales Manager," *id.* at 289–90, signed off on sales contracts with "manager's approval," *id.*, oversaw in some ill-defined way Bautista's work, and counseled her on her performance, *id.* at 63, 66, Czerwien did not have any authority to hire or fire employees, *id.* at 244, 290. Nothing in the record suggests that he had the authority to grant her wage increases or more favorable benefits.

[18] When the alleged harasser is a supervisor with immediate or higher authority over the plaintiff, the plaintiff need only meet the first four elements of the test. *Id.* Because Czerwien was not Bautista's supervisor, she must satisfy all five elements.

of any preventative or corrective opportunities provided by the employer to avoid the harm otherwise." *Casiano*, 213 F.3d at 284.

"[D]etermining whether a hostile-work environment exists takes into account the totality of the circumstances, including such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance." *Donaldson v. CDB Inc.*, 335 F. App'x 494, 501–02 (5th Cir. 2009) (citing *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005)). "The work environment must be 'both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so'" *Id.* (quoting *Aryain v. Wal-Mart Stores of Tex., LP*, 354 F.3d 473, 479 (5th Cir. 2008). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not [do.]" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotation marks and citations omitted).

Bautista belongs to a protected group. MPII does not contest that she was subject to unwelcome sexual harassment based on her sex. While MPII argues there is no evidence that it was "sufficiently severe or pervasive," it provides no support for this argument besides a conclusory statement. ECF No. 79 at 23–24. The Court is not convinced. Bautista testified the harassment occurred continuously over nearly five months, the comments were degrading and insulting, and they invaded her privacy. She testified that this conduct occurred in front of other employees, who themselves also experienced verbal harassment. And it turned physical with Bautista, who claims that these incidents together caused her "emotional and grave mental distress and physical health. " ECF No. 84-1 at 216. While Czerwein denies all this, it is at best an "evenly balanced, no-other-evidence, 'he said/she said' case [in which] either party could prevail at trial."

11

*Casiano*, 213 F.3d at 285. Taking the facts in the light most favorable to Bautista, a reasonable jury could find this rises to "sufficiently severe or pervasive."

Bautista's hostile environment claim fails, however, because there is no evidence in the record to support a finding that MPII "knew or should have known and failed to take prompt remedial action." *Watts*, 170 F.3d at 509. MPII was never told about Bautista's harassment until September 6, 2021, and the last incident occurred on August 31, 2021. MPII's management did not know of these incidents. Nor does the record establish that it should have. Bautista argues that there are disputed issues of fact about whether MPII failed to take appropriate action "in light of complaints about Czerwien by multiple employees," ECF No. 84 at 26, but the record contains no evidence that other employees filed complaints, or otherwise notified MPII, before September 6. Ms. Saez testified she told MPII only on her last day of employment—September 21. And Ms. Moody never told MPII at all. ECF No. 84-1 at 351 ("I never went to [Tips] personally about [Bautista.]").

It is true that when the harasser is not a supervisor, "a plaintiff c[an] still prevail by showing that his or her employer was negligent in failing to prevent harassment from taking place." *Vance*, 570 U.S. at 449. "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." *Id.* But there is no evidence that MPII was negligent. MPII had an employee handbook that contained a policy against discrimination and laid out the procedures for reporting harassment. While "[n]ot every policy eliminates liability," *E.E.O.C. v. Boh Bros. Const. Co.,* 731 F.3d 444, 463 (5th Cir. 2013), there is no evidence that MPII failed to respond to a single complaint or discouraged complaints from being filed. Indeed, the record does not reveal a single complaint of sexual harassment ever being filed.

**III.     Retaliation**

Under Title VII, "an employer may not discriminate against an employee because the employee has 'opposed any practice made an unlawful employment practice ... or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing.'" *LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 388 (5th Cir. 2007) (omission in original) (quoting 42 U.S.C. § 2000e–3). Plaintiffs can rely on both direct and circumstantial evidence to plead a Title VII retaliation claim. "Direct evidence is evidence that, if believed, proves the fact ... without inference or presumption [and] . . . includes any statement or document that shows on its face that an improper criterion served as a basis for the adverse employment action." *Harry v. Dall. Hous. Auth.*, 662 F. App'x 263, 266 (5th Cir. 2016) (per curiam) (citation omitted). If direct evidence is lacking, retaliation claims are analyzed under the familiar *McDonnell Douglas* burden-shifting framework. *See LeMaire*, 480 F.3d at 388. This framework is used to help resolve the central question under Rule 56: whether there is evidence that gives rise to a genuine factual dispute about whether the employer retaliated against the plaintiff for opposing an unlawful employment practice under Title VII.

Under this framework, a plaintiff first establishes a *prima facie* case of retaliation by showing that (1) she participated in an activity protected by Title VII; (2) her employer took an adverse employment action against her; and (3) a causal connection exists between the protected activity and the adverse employment action. *Id.* "An employee engages in protected activity when she opposes an employment practice that she 'reasonably believes' violated Title VII." *Wallace v. Performance Contractors, Incorp.*, 57 F.4th 209, 224 (5th Cir. 2023) (quoting *Badgerow v. REJ Properties, Inc.*, 974 F.3d 610, 619 (5th Cir. 2020)). "[S]tating one's belief that discrimination has occurred 'virtually always' constitutes opposition, except in 'eccentric cases.'" *Id.* (quoting

13

*Crawford v. Metropolitan Gov't of Nashville & Davidson County*, 555 U.S. 271, 276-77 (2009)). "Close timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection[.]" *Swanson v. General Services Admin*, 110 F.3d 1180, 1188 (5th Cir. 1997). "[A] plaintiff must show that the decisionmaker who committed the adverse employment action was aware of the plaintiff's protected activity." *Perches v. Elcom, Inc.*, 500 F. Supp.2d 684, 893 (citing *Manning v. Chevron Chem. Co.*, 332 F.3d 874, 884 (5th Cir. 2003)).

Once a plaintiff makes this showing, the employer must articulate legitimate, nondiscriminatory reasons for its employment action. If the employer articulates such reasons, the burden falls back on the plaintiff to show that the employer's proffered reasons are a pretext for its actual retaliatory purpose. *See Harris*, 329 F. App'x at 550. To establish pretext, the Fifth Circuit examines whether evidence is of "sufficient 'nature, extent, and quality' to permit a jury to reasonably infer discrimination." *Owens v. Circassia Pharmaceuticals, Inc.*, 33 F.4th 814, 826 (5th Cir. 2022) (citing *Crawford v. Formosa Plastics Corp., La.*, 234 F.3d 899, 902 (5th Cir. 2000)). "Pretext can be proven by any evidence that casts doubt on the credence of the employer's proffered justification for the adverse employment action." *Harris v. FedEx Corp. Servs., Inc.*, 92 F.4th 286, 297 (5th Cir. 2024) (quoting *Brown v. Wal-Mart Stores E., L.P.*, 969 F.3d 571, 578 (5th Cir. 2020)).

Ultimately, to survive a motion for summary judgment, a plaintiff must show "a 'conflict in substantial evidence'" on the question of whether the employer would not have taken the adverse employment action but for the protected activity. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 658 (5th Cir. 2012)). "Evidence is substantial if it is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.* at 561–62 (internal quotation marks and citation omitted). "[E]ven if a plaintiff's protected conduct

is a substantial element in a defendant's decision to terminate an employee, no liability for unlawful retaliation arises if the employee would have been terminated even in the absence of the protected conduct." *Owens*, 33 F.4th at 835 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 305 n.4 (5th Cir. 1996)).

### A. Bautista's Retaliation Claim Survives

MPII does not dispute that Bautista satisfies the first two *prima facie* elements. Bautista participated in activity protected by Title VII by filing her complaint with MPII on September 6, 2021, and was terminated on September 7, 2021. MPII management had knowledge of this complaint. And the short span of time is enough to show a causal connection for her *prima facie* case.

Yet MPII has articulated a legitimate, nondiscriminatory reason for its action: it discharged her because she had not shown up for work for several days and believed she had cleared out her desk. Under MPII's "No Call/No Show" policy in its employee handbook, "[d]isciplinary action up to and including immediate termination may be imposed against an employee who is absent for one (1) or more days without proper notice to their supervisor," and "[a]n employee who is absent for two (2) consecutive days without reporting to their direct supervisor will be considered to have abandoned his job and to have voluntary resigned." ECF No. 80–5 at 22. While Bautista testified that she was unaware of this policy, ECF No. 84–1 at 88, that does not make MPII's termination illegitimate.

The inquiry then turns to whether MPII's discharge was pretextual. The key inquiry here is what happened after September 6—when Bautista engaged in protected activity. Bautista relies on the following evidence to demonstrate pretext: (i) the temporal proximity between her protected activity and her termination, (ii) MPII's response to Bautista's complaint, and (iii) the incorrect or

disputed explanation for her termination.[19] While the third is unpersuasive,[20] the others create a conflict in substantial evidence of whether MPII would have discharged Bautista but for her protected activity. In other words, even if Bautista did violate the "No Call/No Show" policy, whether the "real reason" for her termination was the protected activity.

The temporal proximity between Bautista's protected activity and her termination is relevant to, but not alone sufficient to demonstrate, pretext. *See Brown*, 969 F.3d at 579 (citing *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007)). That said, Bautista was terminated *within two days after* she reported the sexual harassment. This timing supports pretext along with other evidence.

Tips admits that MPII did not discuss firing Bautista before September 3, 2021. *Id.* at 229. Nor is there any evidence in the record of discussions between September 3 and September 6 about firing Bautista. Both Tips and Hoffman were unable to provide a specific date they discussed Bautista's firing. Nothing in the record suggests that any other employee had ever been terminated for violating this policy. Viewing the evidence in the light most favorable to Bautista, MPII only discussed firing her after she engaged in protected activity on September 6, 2021. Further, after receiving the September 6 sexual harassment complaint, the record is disputed as to whether any investigation of Czerwin was conducted before the decision was made to terminate Bautista's employment.[21] While "[a] company's failure to follow internal procedures is generally not enough

---

[19] Bautista also argues that it would be improper to credit MPII's "interested witnesses" at this stage. ECF No. 84 at 31-2. This argument questions the credibility of the witnesses which "judges may not evaluate at the summary judgment stage." *Guzman v. Allstate Assurance Co.*, 18 F.4th 157, 161 (5th Cir. 2021).

[20] Pretext turns not on whether the reason was *"incorrect,"* Laxton v. Gap Inc., 333 F.3d 572, 579 (5th Cir. 2003), but whether the "proffered reason was not the real reason for discharge." *Id.* Bautista raises disputed issues of fact as to whether she violated the "No Call/No Show" policy by arguing that she notified MPII of her absences, which Hoffmann confirmed would suffice, and that she did not clear out her desk.

[21] Tips testified that Hoffman conducted a sexual harassment investigation, and that Hoffman spoke with Czerwien right after receiving a September 2021 email. ECF No. 84-1 at 227–28. Hoffman confirmed this. *Id.* at 265. But

to create a genuine issue of material fact as to discriminatory motives," "the nature of the internal policy and the extent of the deviation in a particular case could give rise to pretext in light of all the other relevant facts." *Williams v. City of Austin*, 170 F. Supp.3d 939, 953–54 (W.D. Tex. 2016) (internal quotations and citations omitted); *Rosario v. Texas Veterans Comm'n*, 607 F. Supp.3d 711, 720 (W.D. Tex. 2022) (noting "some courts have found that 'failure to conduct a fair investigation can raise an inference of pretext'") (quoting *Estate of Bassatt v. School Dist. No. 1*, 775 F.3d 1233, 1240 (10th Cir. 2014)). A reasonable jury could find that MPII wanted to forgo an investigation into Czerwin—an employee who had been with the company for over fifteen years—and instead discharged Bautista because she filed her complaint.

Taken together, this evidence "casts doubt," *Harris*, 92 F.4th at 297, on MPII's post-hoc explanation for Bautista's termination. A reasonable jury could find the real reason she was terminated was because she reported the sexual harassment on September 6, not because she violated MPII's policy by failing to show up for work the days prior.

### IV. **Back-Pay Damages**

MPII seeks summary judgment on any back-pay damages Bautista may be awarded at trial. ECF No. 79 at 26–27. Title VII imposes a statutory duty to mitigate under which "[i]nterim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable." 42 U.S.C. § 2000e–5(g)(1); *see Brunnemann v. Terra Int'l, Inc.,* 975 F.2d 175, 179 n. 7 (5th Cir. 1992) ("Courts uniformly offset interim earnings from back pay awards in order to make the plaintiff whole, yet avoid windfall awards." (internal citations omitted)). "Back pay is tolled (that is, not awarded) for the period of

---

Czerwien contradicted Hoffman's account: he testified that nobody from MPII spoke with him in September 2021 (or to date) at all. *Id.* at 247.

time the plaintiff is employed in a comparable position." *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 487 (5th Cir. 2007) (citing *Brunnemann*, 975 F.2d at 178 n.5).

MPII claims that Bautista, following her discharge in September 2021, secured comparable employment with Porter Loring Funeral Home beginning October 1, 2021. ECF No. 79 at 26. Thus, any award must be reduced by her earnings—which spanned from October 1, 2021 through January 5, 2022. MPII further seeks back-pay damage reduction for the amount Bautista could have earned at Porter Loring for the period of January 5, 2022 up to the date of any judgment because it asserts she resigned without justifiable cause. *Id.* at 27.

Bautista failed to respond to this argument or address these facts. Under Fed. R. Civ. P. 56(e), when a party fails to properly address another party's assertion of fact, the Court "may . . . grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show the movant is entitled to it." The Court finds that Bautista's back-pay, if any, shall be reduced by her earnings from October 1, 2021 through January 5, 2022 because she held comparable employment at another funeral home working in sales. *See* ECF No. 80-23 at 15, 43–57.

On the other hand, there are disputed issues of fact as to why Bautista resigned from Porter Loring. Bautista's resignation letter references "the lack of communication and unprofessionalism within the workplace" which "created a very hostile work environment." ECF No. 80–23. Nor has MPII put forth evidence that Bautista failed to use reasonable diligence to obtain "substantially equivalent" employment after she resigned. *See Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)). Because "the employer has the burden of proving failure to mitigate," *id.*, the Court declines to award summary judgment to MPII for potential earnings after January 5, 2022 on this basis without an undisputed record.

### CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (ECF No. 79) is **GRANTED in part and DENIED in part**. Plaintiff's claims against Defendant for sex discrimination and sexual harassment are **DISMISSED WITH PREJUDICE**. Plaintiff's claim against Defendant for retaliation under Title VII and the Texas Labor Code and her claim against Czerwien for assault will **PROCEED** according to the Eighth Amended Scheduling Order (ECF No. 85).

**IT IS FURTHER ORDERED** that any back pay Plaintiff receives shall be reduced by any earnings she received during the period of Porter Loring employment from October 1, 2021 through January 5, 2022.

**IT IS SO ORDERED**.

**SIGNED** this 1st day of November, 2024.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE